### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | |
|---|---|
| BRIAN TAYLOR, | |
| Plaintiff, | |
| v. | CASE NO. 3:23-CV-183-SJF |
| WILLIAM R HYATTE, et al., | |
| Defendants. | |

### OPINION and ORDER

On March 1, 2023, Plaintiff Brian Taylor, an inmate incarnated at the Indiana Department of Corrections ("IDOC"), filed a complaint under 42 U.S.C. § 1983 in the above-captioned case. Plaintiff brought his complaint against three Miami Correctional Facility employees, Warden William Hyatte, Deputy Warden George Payne, and Sergeant Kory Breaton.

On July 7, 2023, the Court granted the Fed. R. Civ. P. 12(b)(6) motion to dismiss brought by Defendants Warden William Hyatte and Deputy Warden George Payne. [DE 16]. The Court allowed Plaintiff leave to proceed on his claim that, while Plaintiff was being housed in Miami Correctional Facility, Defendant Breaton acted with deliberate indifference to his health and safety and failed to take reasonable measures to protect him from assaults by other inmates, in violation of the Eighth Amendment.

On August 15, 2023, the Court held a Rule 16 Preliminary Pretrial Conference, pursuant to which the Court entered certain deadlines focused on Defendant Breaton's affirmative defense contending Plaintiff's failure to exhaust administrative remedies.

[DE 23]. On August 15, 2023, the parties also consented to the jurisdiction of the magistrate judge under 28 U.S.C. § 636(c). [DE 22].

On September 20, 2023, Defendant Breaton moved for summary judgment, pursuant to Fed. R. Civ. P.  56, on the ground that Plaintiff failed to exhaust his available administrative remedies before filing suit as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e. [DE 24]. Defendant Breaton's motion was accompanied by a Memorandum in Support of Motion for Summary Judgment and a Statement of Material Facts in Support of Motion for Summary Judgment. [DEs 25, 26]. In response, Plaintiff Brian Taylor filed a Memorandum of Law in Opposition to Motion for Summary Judgment, accompanied by an Affidavit in Support of Plaintiff's Memorandum of Law, on February 29, 2024. [DEs 32, 33]. Defendant Breaton's motion became ripe on March 12, 2024, when Defendant, in turn, filed a Reply to Response to Motion for Summary Judgment. [DE 34]. The case was then reassigned to the undersigned magistrate judge on August 15, 2024, and the parties did not object to the continued exercise of jurisdiction by the undersigned. [*See* DE 35].

With the parties' continued consent to the undersigned magistrate judge, the Court now enters the following opinion and order addressing Defendant Breaton's pending motion. For the reasons explained below, the Court grants Defendant's Motion for Summary Judgment [DE 24].

## I.    FACTUAL BACKGROUND

The following facts are undisputed.[1] The facts are presented in chronological order, where applicable, and taken in the light most favorable to Plaintiff. Plaintiff was incarcerated at the Miami Correctional Facility ("MCF") in Bunker Hill, Indiana at all times relevant to his complaint. [DE 26 at 1, ¶ 1]. He is currently incarcerated at the Correctional Industrial Facility ("CIF") in Pendleton, Indiana. [*Id*.]. Defendant Sergent Kory Breaton was at all relevant times employed by IDOC as a Sergeant at MCF. [*Id*.].

A few days prior to December 11, 2020, Plaintiff was removed from his cell for three days, during which time his cell phone was stolen and his cellmate was stabbed. [DE 26 at 4, ¶ 22; DE 1 at ¶ 13]. Upon returning to his cell, Plaintiff was also stabbed, repeatedly, which resulted in his transport to an outside hospital by helicopter ambulance. [DE 26 at 5, ¶ 23; DE 1 at ¶ 14]. Plaintiff filed Grievance #121797 and a subsequent grievance on January 4, 2021, as a result of this incident. [DE 26 at 6, ¶ 29; *id*. at 6-7, ¶ 32]. Plaintiff was moved to the MCF infirmary to recover after his stay the hospital and subsequently was placed in restrictive housing on February 13, 2021. [DE 1 at ¶¶ 15-18].

On March 4, 2021, despite his assignment to restrictive housing, Plaintiff was released to an administrative housing unit. [DE 26 at 5, ¶23; DE 1 at ¶ 15]. Plaintiff was once again stabbed by two other inmates. [DE 26 at 8, ¶ 40; DE 1 at ¶ 23]. On March 5,

---

[1] As explained in Section III.A. *infra*, Plaintiff's response brief appears to disregard the Court's local rules, particularly, N.D. Ind. L.R. 56-1(b)(2). The Court has thus considered Defendant's Statement of Material Facts [DE 26], along with affidavits and evidence brought in support of same as undisputed, as permitted by Fed. R. Civ. P. 56(e). *See also* Fed. R. Civ. P. 56(c)(1)(A).

2021, Plaintiff submitted a grievance in the aftermath of this assault. [DE 26 at 8, ¶ 40; DE 24-4 at 10].

Plaintiff also filed several related grievances connected with these two attacks that the Court outlines below:

### A.  Plaintiff's Familiarity with the Grievance Process

IDOC recognizes only one grievance process, the Offender Grievance Process. [DE 26 at 2, ¶ 9]. The Offender Grievance Process is examined in Section III.B.iii., *infra*. IDOC's Offender Grievance Process was (and remains) in place at both of these institutions during Plaintiff's period of incarceration in each [DE 26 at 2, ¶ 9; DE 24-1 at 2, ¶ 7; DE 24-5 at 2, ¶ 8]. All incarcerated individuals at MCF and CIC (where Plaintiff is currently incarcerated) are made aware of said process during admission and orientation proceedings, have continual access to copies of the process in the law library of the institution, and may obtain additional copies of the process from the institution's grievance specialist or other staff in the office of the grievance specialist whenever such are desired (including when the requesting inmate is in restrictive housing or the infirmary)[2]. [DE 26 at 3, ¶ 11; DE 24-1 at 4; DE 24-5 at 4-5].

Plaintiff has submitted an affidavit admitting he is "aware that the IDOC has a grievance process" but denies that he has ever been "personally instructed on the details of this grievance process. [DE 33 at 1, ¶ 2].  Plaintiff further maintains that all he "learned about the grievance process was through word of mouth from other inmates at

---

[2] Defendant's Statement of Facts also relies on the affidavits of grievance specialists Robert Stafford and Michael Gapski, and a copy of the IDOC Offender Grievance Process (Policy No. 00-02-301), cited therein. [DE 24-1, DE 24-5, and DE 24-2, respectively].

the MCF." [*Id.* at ¶ 5].

In reply, Defendant submitted evidence that Plaintiff, upon his admission to MCF, and upon prior and subsequent admissions to other correctional institutions, signed multiple admissions checklists indicating that information regarding those facilities' grievance processes had been communicated to him during his orientation. [DE 24-1 at 2-3, ¶ 9, 4-9]. In particular, Defendant provided copies of admission orientation checklists signed and dated by Plaintiff for July 26, 2010, June 7, 2010, March 15, 2021, August 12, 2021, and September 22, 2022. [*Id.*]. Two of those signed checklists were from when Plaintiff was admitted to MCF and CIF. [*Id.*]. Further, the March 27, 2023, "History of Grievances" document maintained for Plaintiff by IDOC reflects that Plaintiff utilized these processes through the appeal stage on at least one occasion prior to the events at issue in this case, when he filed both a formal grievance and a formal appeal on the topic of visitation in July and August of 2011, while a resident of Indiana State Prison. [DE 24-3]. Another formal grievance unrelated to this case, one concerning personal property, was filed in October 2017, when he was a resident of MCF, and was accepted by both the institution and Plaintiff without an appeal. [*Id.*]. Since being transferred from MCF to CIC, Plaintiff has filed one additional grievance, which he has not appealed. [*Id.*].

### B. Grievances at Issue

To reiterate, the present case arose because on December 11, 2020, and March 4, 2021, Plaintiff was attacked by fellow inmates at MCF. [DE 26 at 5, ¶¶ 23-24]. Plaintiff now alleges that, in relation to these occasions, Defendant failed to take reasonable

measures to protect him from violence and acted with deliberate indifference to his health and safety. [*Id*. at 5, ¶ 25]. Before filing this case, around December 2020 and March 2021, Plaintiff attempted to submit a number of grievances relating to these attacks. [*Id*. at 5-9, ¶¶ 28-42].

The first grievance Plaintiff filed in relation to either the above-mentioned December 11, 2020, or March 4, 2021, attacks was Grievance #121797. [*Id*. at 5, ¶ 29]. Grievance #121797, which gives the "incident date" in question as December 8, 2020, contains Plaintiff's recollection of the events leading up to the December 11th attack. [DE 24-4 at 1]. In short, on December 8, 2020, Plaintiff was removed from his cell during a search. [DE 1 at ¶ 10; DE 26 at 4, ¶ 22]. He was kept in another location for three days. [*Id*.]. Owing to what the officer who carried out the search termed a "miscommunication or lack thereof," Plaintiff's belongings were left unsecured in his cell during this time. [DE 24-4 at 2; DE 26 at 5-6, ¶¶ 28, 29-31]. Plaintiff alleges that, upon returning to his cell on December 11, 2020, he found that various articles of his personal property had been stolen and that his cellmate had been stabbed. [DE 1 at 3, ¶ 13]. Later that day, Plaintiff himself was assaulted and stabbed by other incarcerated individuals. [DE 26 at 5, ¶ 23]. After reciting these events, Plaintiff concludes, "I almost died and suffered a collapsed lung all because Sgt. Heishman did not secure my property correctly." [DE 26 at 6, ¶ 30; DE 24-4 at 1]. Plaintiff further states that he "would like to be [reimbursed] for [his] property and [for] Sgt. Heishman [to be] reprimanded and held accountable for his actions." [DE 26 at 6, ¶ 31; DE 24-4 at 1]. Sgt. Heishman is the only officer named in the grievance. [*See* DE 26 at 6, ¶ 30; DE 24-4 at 1].

This grievance was dated December 16, 2020, by Plaintiff and stamped "received" on December 30, 2020, by the facility grievance specialist. [DE 26 at 6, ¶ 30; DE 24-4 at 1]. It was accepted, and a response was provided on January 25, 2021. [DE 26 at 7, ¶ 35; DE 24-4 at 1]. The response reads, in part, "You will need to file a tort claim for the value of the lost/stolen property. Sgt. Heishman" – who was contacted and provided an explanation for actions he took during the search of Plaintiff's cell on December 8th – "did not maliciously leave your property unsecure . . . If he would have been made aware that you were not returning, the proper steps would have been taken to secure your property." [DE 24-4 at 1] Plaintiff did not sign this response or check a provided space indicating either agreement or disagreement with it, and no formal appeal was commenced by Plaintiff. [DE 26 at 7 ¶ 36; DE 24-4 at 1].

In his response, Plaintiff states that Grievance #121797 was the only grievance he submitted successfully as a result of the assault that occurred in December 2020.[3] [DE 32 at 3]. Plaintiff also submitted two forms requesting reimbursement for his property, on or around January 25th, and February 8th, respectively. [DE 26 at 7, ¶¶ 34, 37].

Plaintiff's next relevant grievance is dated February 16, 2021. [DE 26 at 7, ¶38; DE 24-4 at 8-9].  In it, Plaintiff writes "in regards to . . . being put on DWRHU ["Department-Wide Restrictive Housing Unit"] status": "I never got into any type of

---

[3] On January 4, 2021, Plaintiff *attempted* to file a second grievance regarding the December 2020 assault. This grievance made substantially the same claims and requests as Grievance #121797, except that it also named a Sgt. Caldwell as someone who "knew of the situation" and "never returned [Plaintiff's] belongings." [DE 24-4 at 3]. This grievance was returned to Plaintiff on January 15, 2021, having been rejected both because it was not timely submitted and because "value of lost/stolen property goes through a tort claim." [*Id*. at 4]. Plaintiff did not appeal this grievance. [DE 26 at 7, ¶ 33].

trouble . . . to be labeled any such thing. . . . It has to be a mistake . . . I'm not grieving being put into A/S pending [transfer. I'm] just trying to get the DWRHU off my classification[,] please." [DE 24-4 at 8]. In the section requesting a statement of the relief sought, he writes, "I would like this DWRHU to get [taken] off my classification so I can just be a regular [Level Three transfer] for [failure] to adjust[. T]hank you." [*Id.* at 8]. This grievance appears to be responding to the fact that, beginning in mid-February of 2021, after stays in an outside hospital and the MCF infirmary following the December 2020 assault, Plaintiff had been assigned to a "Restrictive Housing Unit." [DE 1 at 3, ¶¶ 15-18]. The grievance was returned to Plaintiff on February 24, 2021, rejected for the reason that the "concern is a matter not appropriate to the grievance process" and "may be better addressed by Classification or the Disciplinary Hearing Board." [DE 24-4 at 9]. No attempt was made to revise or re-submit this grievance. [DE 26 at 7, ¶¶ 38-39].

The next grievance Plaintiff submitted pertained to the aftermath of a separate, second assault. [DE 26 at 8, ¶ 40; DE 24-4 at 10]. The grievance is dated March 5, 2021[4], and the "statement of . . . complaint or concern" portion of it, which is sufficient to describe the nature of the relevant events, reads in full:

> I was in ACH on ad-seg and was released to population on accident to N-cellhouse. I was placed on dorm with the person(s) who assaulted me [previously, in December 2020]. There was [illegible] on us. [T]hen once it was noticed several hours later I returned to ACH [b]ut to a different cell[,] 226[.] I was only in there for several hours[.] [O]nce rec started 2 inmates ran in my room with a knife. I was sitting on the bed talking to my wife then the assault

---

[4] The date filling the "[d]ate grievance received" field of the "Return of Grievance form" (March 9, 2021) differed from the date provided on Plaintiff's original Offender Grievance Form (March 5, 2021), and the grievance was marked as having been submitted late. [DE 24-4 at 10-11]. However, Defendant does not allege that this grievance was untimely, so this remark on the grievance form will be disregarded. [*See* DE 26 at 8, ¶41].

8

started[.] I was fighting for my life[.] I don't know any names, I [had] never even seen the inmates ever[.] In the process I got stabbed and [written] up for an A-102 assault[.] I was just protecting myself[,] I never intended to do [any] wrong to [anybody.] I never left my cell for rec time[.]

[DE 24-4 at 10]. In the section of the grievance form asking the offender to "state the relief that you are seeking," Plaintiff wrote, "I'm just trying to state the facts of the night I was assaulted and get the write-up [thrown] out. I know this [is] prison [b]ut I was just protecting my life. Thank you a lot." [*Id.*]. The grievance was rejected and returned to Plaintiff on March 23, 2021. [DE 26 at 8, ¶ 41; DE 24-4 at 11]. The "Return of Grievance" form reflects that the facility grievance specialist deemed the "concern . . . a matter not appropriate to the grievance process" that "may be better addressed by Classification or the Disciplinary Hearing Board." [DE 26 at 8, ¶ 41; DE 24-4 at 11].

Plaintiff did not revise or re-file the grievance but did seemingly pursue the matter further with the "Disciplinary Hearing Board": As alluded to above, the incident referenced in this grievance had resulted in Plaintiff receiving a disciplinary citation, which was issued by Defendant. [DE 32-2]. According to the "Report of Conduct" that Defendant wrote on March 4, 2021, Defendant was on duty at the time of the attack and saw another inmate entering Plaintiff's cell and the inmates "grabbing each other in an aggressive manner," which prompted him to order the offenders first to "break it up" and then to "lockdown." [DE 32-2]. According to Defendant, during the search that followed the attack, Plaintiff stated to Defendant that the inmate who attacked him "entered his cell and began to assault him with a sharpened metal object," which Plaintiff then "managed to get . . . and [used to strike the other inmate] . . . several

times." [*Id.*] Defendant cited Plaintiff for "Battery Against an Offender." [DE 32-2].
Subsequent to Defendant making his "Report of Conduct," Plaintiff was provided with
a "Notice of Disciplinary Hearing" [DE 32-1]. Using that form, dated April 9, 2021,
Plaintiff pleaded "Not Guilty" to the infraction in question ("Battery Against
Offender"), asked for physical evidence in the form of footage from a camera covering
"AHU/225/226," and requested two witnesses to be called (first, an Ofc. Alcalla, to
speak to whether "offender [was] in room on phone [and whether] any other offender
assaulted him," and second, Defendant, Sgt. Breaton, to answer the question, "Did you
say you wouldn't write [offender] up because you saw the situation?"). [*Id.*].

Access to the camera footage was denied on June 3, 2021, on the grounds that
"[a]llowing Offender Taylor, Brian DOC 120783 to view the video evidence would
jeopardize the safety and security of the facility because[,] if he were permitted to watch
the video, he might learn of the location and capabilities of the prison surveillance
system, thus allowing him to avoid detection in the future." [DE 32-3]. It appears that,
on a date not clear from the evidence presented, notes were added to Plaintiff's
completed Notice of Disciplinary Hearing regarding his requests for witness testimony:
A check mark appears next to the name of Ofc. Alcalla, and a mark resembling a dash
or a minus sign can be seen next to the name of Defendant. Underneath Defendant's
name is a note reading, "Irrelevant [the Report of Conduct] is written by Sgt. Breaton."
[DE 32-1]. After the making of these notes, it does not appear that any further action
was taken by either Plaintiff or Defendant in relation to the March 2021 assault or
resulting disciplinary citation until March 1, 2023, when Plaintiff filed this case.

## II.    LEGAL STANDARD

Summary judgment is appropriate when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *Celotex Corp. v. Catrett, 477 U.S. 317 (1986)*. A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, *477 U.S. 242, 248 (1986)*. A "genuine issue" of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore,* 351 F.3d 278, 282 (7th Cir. 2003).

Accordingly, the Court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is a material dispute that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Indeed, the court is not "obligated to research and construct legal arguments for parties, especially when they are represented by counsel." *Nelson v. Napolitano,* 657 F.3d 586, 590 (7th Cir. 2011).

Thus, to overcome a motion for summary judgment, the nonmoving party

cannot rest on the mere allegations or denials contained in his pleadings. Rather, the nonmoving party must present sufficient evidence to show the existence of each element of his case on which he will bear the burden at trial. *Celotex*, 477 U.S. at 322-23; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). "Sworn affidavits, particularly those that are detailed, specific, and based on personal knowledge are 'competent evidence to rebut [a] motion for summary judgment.'" *Kaba v. Stepp*, 458 F.3d at 681 (2006) (quoting *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004) (*per curiam*)). "'Most affidavits are self-serving, as is most testimony, and this does not permit a district judge to denigrate a plaintiff's evidence when deciding whether a material dispute requires trial.'" *Id.* (quoting *Wilson v. McRae's, Inc.*, 413 F.3d 692, 694 (7th Cir. 2005)). But where a factual record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In other words, "[s]ummary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (quotations omitted); *see also Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

Plaintiff alleges that Defendant Breaton acted with deliberate indifference to his health and safety, in failing to protecting him from assault. Defendant has moved for summary judgment contending that the undisputed material facts show that Plaintiff failed to exhaust the administrative remedies available to him prior to bringing his

lawsuit.

## III.  DISCUSSION

### A.  Procedural Deficiencies with Plaintiff's Response

As stated, Defendant moved for summary judgment on September 20, 2023. [DE 24]. Under this Court's local rules[5], a party moving for summary judgment must separately file: (1) a motion; (2) a supporting brief; and (3) a statement of material facts with numbered paragraphs for each material fact the moving party contends is undisputed which includes (A) a short statement of each fact; and (B) a citation to evidence supporting each fact. *See* N.D. Ind. L.R. 56-1(a). Defendant's summary judgment filings comport with these rules, thus meeting his obligation as the moving party. [*See* DE 24 (motion); DE 25 (supporting brief); and DE 26 (statement of material facts)].

Plaintiff then responded on February 29, 2024, after requesting and receiving two extensions. [DE 32]. Under this Court's local rules, a party opposing summary judgment must separately file: (1) a response brief and (2) a Response to Statement of Material Facts that (A) restates verbatim the Statement of Facts, (B) includes a correspondingly numbered response immediately following each paragraph of the Statement of Facts, (C) cites to evidence supporting each dispute of fact, and (D) includes additional facts in a section titled Additional Material Facts with numbered paragraphs continuing the sequential numbering of the Statement of Material Facts for

---

[5] The applicable rules became effective on February 25, 2022, a little over a year and six months before the instant motion was filed.

each additional material fact the opposing party contends is undisputed which includes both (i) a short statement of each fact, and (ii) a citation to evidence supporting each fact. *See* N.D. Ind. L.R. 56-1(b).[6]

Plaintiff does include a "Memorandum of Law in Opposition" as contemplated by N.D. Ind. L.R. 56-1(b)(1). [*See* DE 32]. But Plaintiff's response ignores the requirements listed in N.D. Ind. L.R. 56-1(b)(2). Instead of including a separately filed Response to Statement of Material Facts as required by N.D. Ind. L.R. 56-1(b)(2), Plaintiff's Memorandum of Law in Opposition merely includes two paragraphs purporting to outline material facts in dispute. [DE 32 at 1-2]. Neither of those paragraphs was paired with either a corresponding paragraph from Defendant's motion or a citation to evidence.

Plaintiff's Affidavit [DE 33], further, does not "restate[] verbatim the [Defendants'] Statement of Facts" nor does it include "a correspondingly numbered response immediately following each paragraph of the Statement of Facts" or a citation to evidence supporting each dispute of fact. *See* N.D. Ind. L.R. 56-1(b)(2). Plaintiff's Affidavit thus also fails to include a list of additional facts in a section titled Additional Material Facts as required. Thus, Plaintiff has not met his obligations as the nonmoving party under the local rules.

Defendant does not raise these procedural deficiencies in his reply brief. Despite

---

[6] The rule applies when an opposing party is represented by counsel—and Plaintiff has been represented by counsel during the course of this case. *See* N.D. Ind. L.R. 56-1(b)(3) (exempting *pro se* parties from this requirement).

this, "[t]he district court is entitled to require strict enforcement with its local rules."

*McCormick v. Goebel*, 655 F. Supp. 3d 748, 756 (N.D. Ind. 2023)(citing *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218-19 (7th Cir. 2015). The Court included these requirements in the local rules because they facilitate the Court's ability to efficiently and justly resolve motions for summary judgment. Thus, parties' "[c]ompliance with these rules demonstrates respect for the process." *Robertson v. Marthakis*, No. 3:22CV887 DRL-AZ, 2025 WL 1784690, at *5 (N.D. Ind. June 25, 2025). When a party fails to comply with the local rules, the Court must then wade through a long record to find disputes of fact. But "[j]udges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991); *see also Litsinger v. Forest River, Inc.*, 536 F. Supp. 3d 334, 353 (N.D. Ind. 2021) (stating that "it isn't the court's job to find the needle in the haystack, the truffle in the field, or the Waldo on the page."). Accordingly, a non-moving party's failure to admit or deny facts as presented in the moving party's statement of facts "render[s] the facts presented by the moving party as undisputed." *Curtis*, 807 F.3d at 218-19; *see also* Fed. R. Civ. P. 56(e) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . .").

Thus, the Court must determine whether to treat Defendant's Statement of Material Facts as undisputed here. Plaintiff was afforded two extensions of time before ultimately responding in opposition to summary judgment on February 29, 2024. [DEs 28, 31]. This suggests that the deficiencies did not stem from a lack of time. Rather, it suggests a lack of awareness of the Court's rules at the time the response was filed.

Plaintiff never sought leave to address the deficiencies. Based on these circumstances, as well as Plaintiff's total failure to comply with the rules, the Court can only consider the facts listed by Defendant in his Statement of Material Facts [DE 26, ¶¶ 1-43] and designated evidence as undisputed, consistent with other courts in this district. *See* Fed. R. Civ. P. 56(c); *Szczepanski v. Dana, Inc.*, No. 1:22-CV-00318-GSL, 2024 WL 3594693, at *1 fn. 1 (N.D. Ind. July 31, 2024) (accepting the moving party's Statement of Facts as true where the non-moving party—"ma[d]e no attempt to comply with Fed. R. Civ. P. 56 or N.D. Ind. L.R. 56-1(b)"); *Buckley v. S.W.O.R.N. Prot. LLC*, No. 20-CV-357, 2022 WL 4598577, at *1 (N.D. Ind. Sept. 30, 2022) (same); *but see Downey v. Hyatte*, No. 3:21-CV-131-SJF, 2025 WL 901559, at *2 (N.D. Ind. Mar. 25, 2025) (granting other counsel leave to amend his response to a motion for summary judgment when counsel's original response did not comply with N.D. Ind. L.R. 56-1(b)).

Based on Plaintiff's failure to follow N.D. Ind. L.R. 56-1(b), and in the interests of efficiency and justice, the Court has endeavored to set forth the undisputed facts based on the parties' submissions and designated evidence and will treat Defendant's Statement of Material Facts as undisputed. *See* Fed. R. Civ. P. 1.

### B. Merits Analysis

#### i. Requirement to Exhaust Administrative Remedies

Here, Plaintiff has brought a § 1983 claim against Defendant. Plaintiff alleges that Defendant violated the Eighth Amendment by failing to protect him from the attacks that occurred in December 2020 and March 2021. Defendant has moved for summary judgment, contending that the undisputed material facts show that Plaintiff failed to

exhaust the administrative remedies available to him.

Under the Prison Litigation Reform Act, "no action shall be brought [under federal law] with respect to prison conditions . . . by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Pursuant to 42 U.S.C. § 1997e(a), prisoners are required to exhaust available administrative remedies prior to filing lawsuits in federal court. The Seventh Circuit has taken a "strict compliance approach to exhaustion." *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). In other words, "a prisoner who does not properly take each step within the administrative process has failed to exhaust state remedies." *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002). "To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Id.* at 1025; *Perez v. Wisconsin Dep't of Corr.*, 182 F.3d 532, 535 (7th Cir. 1999). "Failure to exhaust is an affirmative defense that a defendant has the burden of proving." *King v. McCarty*, 781 F.3d 889, 893 (7th Cir. 2015).

In our circuit, it has been the case for some time that the course "to be followed in a case in which exhaustion is contested is . . . as follows: [First, t]he district judge conducts a hearing on exhaustion and permits whatever discovery relating to exhaustion he deems appropriate." *Pavey v. Conley*, 544 F. 3d 739, 742 (7th Cir. 2008). Second, "[i]f the judge determines that the prisoner did not exhaust his administrative remedies, the judge will then determine whether (a) the plaintiff has failed to exhaust his administrative remedies," such that "he must go back and exhaust; (b) or [sic] although he has no unexhausted administrative remedies, the failure to exhaust was

innocent…and so he must be given another chance to exhaust…; or," finally, "(c) the failure to exhaust was the prisoner's fault, in which event the case is over." *Id.* Third, "[i]f and when the judge determines that the prisoner has properly exhausted his administrative remedies, the case will proceed to pretrial discovery, and if necessary a trial, on the merits"; and should there be a jury trial, "the jury will make all necessary findings of fact without being bound by (or even informed of) any of the findings made by the district judge in determining that the prisoner had exhausted his administrative remedies." *Id.* Thus, hitherto, jury trials have not been required on the issue of exhaustion.

In June 2025, the Supreme Court of the United States resolved a circuit split on this point by holding "as a matter of statutory interpretation that parties have a right to a jury trial on PLRA exhaustion when that issue is intertwined with the merits of a claim that falls under the Seventh Amendment." *Perttu v. Richards*, 605 U.S. 460, 468 (2025). However, *Perttu* is to be distinguished from this case. In *Perttu*, the respondent "allege[d] that he was sexually abused by petitioner Thomas Perttu, a prison employee[,]" and "that when he tried to file grievance forms about the abuse, Perttu destroyed them and threatened to kill him if he filed more." *Perttu*, 605 U.S. at 464. When Richards sued Perttu for violating his constitutional rights, including his First Amendment right to file grievances . . . Perttu responded that Richards had failed to exhaust available grievance procedures as required by the PLRA." *Id.* It was agreed by both parties "that the exhaustion and First Amendment issues are intertwined, because both depend on whether Perttu did in fact destroy Richards's grievances and retaliate

against him," and the question presented was simply whether, given that fact, there was "a right to a jury trial on PLRA exhaustion." *Id.* Here, by contrast, not only was it neither agreed nor argued that the issue of exhaustion is intertwined with the merits of Plaintiff's Eighth Amendment case, but it is clear from the evidence presented that it is not. Here, Plaintiff's claims are that Defendant failed to protect him, not that Defendant prevented him from submitting grievances pertaining to that claim.

Though Plaintiff says that "at the time [he] submitted grievance number 121797 . . . [he] was in the infirmary suffering substantial pain from multiple stab wounds" and other injuries he sustained in the attack of December 2020, he does not allege that his condition prevented or hindered him from submitting that grievance, which in any case is a grievance that does not name Defendant. Likewise, there is no mention in the record of the violence done to him on March 5, 2021 preventing Plaintiff from filing a grievance in relation to it, much less of Defendant being involved in such prevention. While Plaintiff does argue, as will be elaborated upon below, that administrative remedies were made unavailable to him, the alleged unavailability stemmed, he says, from the institutional failure to instruct him in grievance procedures and failure take timely action with respect to the grievances he submitted, not from Defendant's failure to protect him, which is the substance of his §1983 claim. Thus, Plaintiff's claims do not merit a jury trial on the issue of PLRA exhaustion here.

### ii.  IDOC's Grievance Process

In order "[t]o exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, [as] the prison's administrative rules require." *Pozo v.*

19

*McCaughtry*, 286 F.3d at 1025. Here, as examined in Section III.B.iii, *infra*, Defendant

brings his motion for summary judgment based on his argument that Plaintiff failed to

exhaust the administrative remedies available to him before bringing this suit.

As outlined in IDOC's "Manual of Policies and Procedures," the "Offender

Grievance Process" contained therein is the only administrative remedy officially

recognized by IDOC for the resolution of offenders' grievable issues. [DE 26 at 2, ¶ 10;

DE 24-2 at 3]. The grievance process involves three steps: 1) formally attempting to

solve a problem or concern following unsuccessful attempts at informal resolutions

through the submission of a written grievance, 2) appealing in writing to the

warden/designee, and 3) appealing in writing to the "Department Grievance

Manager." [DE 26 at 3, ¶ 12; DE 24-2 at 3]. According to IDOC's policies, an aggrieved

inmate must use the proper grievance forms and must timely file each grievance and

follow the above three steps within the time specified in the offender grievance process

in order to obtain relief. [DE 26 at 3-4, ¶¶ 12-20; DE 24-5 at 2-3, ¶¶ 9-10].  Some matters

are not grievable under this process, including "classification actions or decisions,"

"disciplinary actions or decisions," and "[t]ort [c]laims seeking monetary

compensation[.]" [DE 24-2 at 3-4].

According to IDOC's process, an incarcerated individual submitting a grievance

on an informally unresolved issue must complete and submit State Form 45471,

"Offender Grievance," no later than ten (10) business days from the date of the incident

giving rise to the complaint. [*Id*. at 9]. Once a grievance is submitted, it is reviewed

within ten (10) business days of its receipt and is either accepted and recorded or

rejected. [*Id*. at 10]. If a grievance is accepted, it is logged and entered into the computer system and is visible on an incarcerated individual's "History of Grievances." [DE 24-5 at 3, ¶ 12]. If a grievance is rejected, it is returned to the incarcerated individual with State Form 45475, "Return of Grievance," identifying the reasons for its rejection. [DE 24-2 at 10]. If a grievance is rejected and the incarcerated individual still wishes to pursue it, it is the incarcerated individual's responsibility to make any necessary changes and re-submit the form within five (5) business days from the date that it is returned. [*Id*.]. If a grievance is accepted but the incarcerated individual is not satisfied with the response of the grievance specialist, the incarcerated individual may appeal the response by completing State Form 45473, "Grievance Appeal." [*Id.* at 12].

An appeal "must address the basic matter of the grievance"; and while the appeal "may contain additional facts or information regarding the original issue and may raise concerns regarding the response from the previous level, . . . it shall not raise new or unrelated issues." [*Id*.]. In it, "[t]he offender must state why the previous response was unacceptable, thereby establishing a rationale for the appeal and the basis for a reinvestigation." [*Id*.]. Appeals "must be legible, signed, and dated by the offender, unless the offender cannot sign . . . and a staff member has indicated why the offender was not able to sign." [*Id*.] The incarcerated individual must submit an appeal within five (5) business days after the date of the grievance response. [*Id*.]. Once received, the date of receipt is logged and the appeal is forwarded to the office of the warden/designee, generating a receipt for the appeal. [DE 24-5 at 4, ¶ 16]. The inmate is then provided a copy of State Form 56285, "Receipt of Facility Level 1 Grievance

Appeal." [*Id*.]. Normally, "Warden/designee responses to offender appeals shall be completed within ten (10) business days," though "the Warden/designee . . . may extend the deadline . . . for ten (10) business days" at a time, provided the offender is notified of the extension(s). [DE 24-2 at 13-14.  In the case of a "delay in responding to a request for grievance, or an appeal that goes beyond [a] second ten (10) business [day extension]," then "the…appeal is deemed to have been denied and the offender is permitted to proceed to the next step of the grievance process, if any step remains"; but "[i]f no step remains, the offender has exhausted all remedies at the Department level." [*Id*. at 14]. There is a corresponding process for a further appeal to the "Department Grievance Manager," whose decision is final [*Id*. at 13].

In the case of an emergency, "an offender may submit an emergency grievance to the nearest staff member, who shall immediately submit the grievance to the Offender Grievance Specialist," who, in turn, "shall immediately bring an emergency grievance to the attention of the Warden/designee for review and response within one (1) business day of recording the emergency grievance." [*Id*. at 5]. Any "action on any emergency grievance may be appealed by the offender within one (1) business day of receiving the response . . . [and t]he Department Offender Grievance Manager shall issue a final Department decision within five (5) business days of the offender filing the grievance." [*Id*.]. Where there is an emergency grievance, both the "initial response and final Department decision shall document the Department's determination whether the offender is in substantial risk of imminent danger and the action taken in response to the emergency grievance." [*Id*.].

### iii.   Arguments of the Parties

Defendant maintains that Plaintiff failed to exhaust his administrative remedies by failing to follow the grievance process outlined above, and that this warrants the entry of summary judgment for Defendant under the PLRA. Defendant argues that "Mr. Taylor failed to exhaust his administrative remedies by," first, "never filing a successful grievance related to his attacks on either December 11, 2020, or March 4, 2021"; second, "never appealing Grievance #121797, assuming it could be considered a grievance, about the December 11, 2020, attack"; and, third, "never revising and/or re-filing his January 4, 2021, February 16, 2021, and/or March 5, 2021, attempted grievances which were properly screened, rejected, and returned to him, per IDOC's Grievance Policy." [DE 25 at 8-9]. Accordingly, Defendant argues, given that the Plaintiff failed in these ways "to exhaust the administrative remedies available to him, his claims are now barred." [*Id.*].

Defendant argues that Plaintiff's failure to appeal the only one of the above grievances that was accepted and investigated by MCF, or to revise and re-submit either of the two grievances that were rejected and returned to him after screening, is sufficient to demonstrate a failure to exhaust, because it constituted a failure to "comply fully with applicable procedural rules and deadlines" [DE 25 at 4 (citing *Woodford v. Ngo*, 548 U.S. 81, 90 (2006))] and "to take each step in the process [to] file complaints and appeals in the place, and at the time, the prison's administrative rules require [*Id.* (citing *Pozo*, 286 F.3d at 1025)]. Failing to appeal accepted grievances or re-submit rejected grievances, says Defendant, "necessarily meant that [Plaintiff] failed to complete each

step of the grievance process" with respect to the issues he grieved "and, therefore, failed to exhaust his administrative remedies." *Id.* at 7. Moreover, Defendant argues that Plaintiff failed to grieve the matter at the center of this case at all. Plaintiff, says Defendant, never wrote a grievance, or amended any previous grievance, "alleg[ing] he was in danger, that he warned any correctional officer, including Sgt. Breaton, of any impending harm, that Sgt. Breaton failed to take any action to protect him from an impending harm, or that he needed to be transferred or otherwise protected from any impending harm. *Id.* at 10. In failing to do this, contends Defendant, citing *Bowers v. Dart*, 1 F.4th 513, 517-18 (7th Cir. 2021), Plaintiff created "a disconnect between a prisoner's grievance and Complaint" that "mean[s] that the prisoner has failed to exhaust his or her administrative remedies." *Id.* at 3.

Plaintiff responds with two arguments, or two material facts he believes to be in dispute:[7] First, he argues that "[t]he grievance process was not an available remedy to Taylor as he had never been instructed on the grievance process required by the Miami Correctional Facility. Moreover, the MCF itself failed to follow the grievance process and should be estopped from raising such a defense." Second, "the grievance documents filed by Taylor constitute substantial compliance with the grievance process in place at the Miami Correctional Facility." However, even viewing the facts in the light most favorable to Plaintiff, neither of his arguments demonstrates to the Court the

---

[7] As explained in Section III.A., *supra*, Defendant's Statement of Material Facts has been accepted as undisputed. Second, Plaintiff has not contested the credibility of the signed documents Defendants provided in support of Plaintiff's knowledge of the grievance process.

existence of a disputed material fact. The Court will address each of Plaintiff's arguments in turn.

### iv. Applicability of the Substantial Compliance Doctrine

Plaintiff argues that he substantially complied with the grievance process, and so any technical failure to comply should be excused. In support of his argument, Plaintiff only contends, citing "the PLRA is concerned with remedies that result from the grievance process" and notes that "[a]fter the second assault upon Taylor the facility attempted another remedy, which was to transfer Taylor from MCF to Westville Correctional Facility, which took place on March 11, 2012." Defendant replies succinctly, quoting the same portion of *Lewis* just highlighted by the Court, that "for causes of action that accrue after the PLRA's 'invigoration of the exhaustion prescription,' the substantial compliance doctrine is not available" in our circuit; and Defendant is correct. *Id.* at 834.

As was noted in *Lewis v. Washington*, 300 F.3d 829, 833 (2002) (quoting *Booth v. Churner*, 532 U.S. 731, 739 (2001)), "[e]xhaustion of administrative remedies is mandatory because the PLRA 'eliminated the [district courts'] discretion to dispense with [it].'" That being said, "some courts apply a substantial compliance doctrine to cases where the cause of action accrued prior to April 26, 1996 (effective date of the PLRA)"; and "in those cases, a prisoner need only show that he substantially complied with the prison's grievance policy by 'clearly giving the institution notice of his particular demands and reasonably triggering an attempt to resolve them.'" *Id.* at 833-834 (citing *McCoy v. Gilbert*, 270 F.3d 503, 512 (7th Cir. 2001); *Curry v. Scott*, 249 F.3d 493,

502 (6th Cir. 2001); *Wolff v. Moore*, 199 F.3d 324, 327 (6th Cir. 1999)). This "avoid[s] the injustice of requiring exhaustion of remedies that were not required to be exhausted at the time of the alleged conduct and could no longer be exhausted when the PLRA became effective." *Id.* at 834 (citing *McCoy*, 270 F.3d at 512; *Wyatt v. Leonard*, 193 F.3d 876, 879-80 (6th Cir. 1999); *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999)). However, the Seventh Circuit has thus far "decline[d] to extend this narrow exception[.]" *Id.* (citing *Smith v. Zachary*, 255 F.3d 446, 452 (7th Cir. 2001)). Thus, for causes of action that "accrued after the PLRA's 'invigoration [of] the exhaustion prescription,' the substantial compliance doctrine is not available[.]" *Id.* at 834 (quoting *Porter v. Nussle*, 534 U.S. 516, 122 S. Ct. 983, 988, 152 L. Ed. 2d 12 (2002)).

Given the narrow scope of the substantial compliance exception outlined above, Plaintiff's substantial compliance argument is not compatible with the caselaw in our circuit.

### v. Availability of Administrative Remedies

For his second argument, Plaintiff asserts that administrative remedies at MCF were unavailable to him because he had never been made aware of them, and also, it seems, because "the facility itself is flaunting and disregarding the very procedures that it now complains he failed to follow" by rejecting his March 5, 2021, grievance on the basis of untimeliness. The latter reason will be considered below. In relation to the former, Plaintiff insists in a sworn affidavit that, while he is "aware that the IDOC has a grievance process," he has "never been personally instructed on the details of this grievance process," and that what he "learned about the grievance process was through

word of mouth from other inmates at the MCF." [DE 33 at 1, ¶ ¶ 2, 5]. It is his recollection that "[a]t no time during [his] entire stay at MCF did any staff personnel ever review, explain, or otherwise communicate the details of the Offender Grievance Process which is attached to Defendant's Motion for Summary Judgment as document 24-2 (15 pages) [sic.]." [*Id.* at 1, ¶ 4]. This being the case, he says, his understanding of the grievance process up to this point has been only that he is "required to submit a form known as an 'Offender Grievance Form' and detail the incident that occurred," which requirement he believes he met in relation to "the assault that forms the gravamen of his § 1983 claim against the defendant." [*Id.* at 1, ¶ 3; DE 32 at 3].

Inmates are only required to exhaust administrative remedies that are available to them. *Woodford,* 548 U.S. at 102 (2006). The availability of a remedy is not a matter of what appears on paper but rather whether the process was available for the prisoner to pursue. *Kaba,* 458 F.3d at 684. Thus, when prison staff hinder an inmate's ability to use the administrative process, such as by failing to provide him with the necessary forms, administrative remedies are not considered available. *See id.* In essence, "[p]rison officials may not take unfair advantage of the exhaustion requirement . . . and a remedy becomes 'unavailable' if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting." *Dole,* 438 F.3d at 809.

Plaintiff cites *Dale v. Lappin,* 376 F.3d at 656 (7th Cir. 2004), in support of the proposition that "[w]hen inmates cannot comply with the grievance procedure without essential help from prison officials and that assistance is not given[,] the failure of

prison officials to facilitate the grievance procedure effectively renders administrative remedies unavailable." [DE 32 at 2]. However, Plaintiff fails to address the important facts in that case that materially differ from this case. The plaintiff-inmate in *Dale* "explain[ed] that he requested the proper grievance forms several times [but] . . . was told that the employees did not have grievance forms," and "he provided sufficiently specific facts to support his allegation that he requested the correct grievance form" by, amongst other things, "identif[ying] the prison employees from whom he requested forms: his counselor, his case manager, the on-duty floor officer, and members of his unit team" and "identif[ying]the specific form he requested." *Dale,* 376 F.3d at 655-656. Plaintiff has not alleged or presented evidence, general or specific, that he requested instruction on how to compose grievances and that his request was denied. Further, it is clear that Plaintiff was able to obtain the proper grievance forms upon his request. Therefore, *Dale*, does not support Plaintiff's argument, and he has provided no other binding precedent.

Yet, while regarding all statements in Plaintiff's affidavit as true, the contention that Plaintiff had neither instruction on the grievance process at MCF nor the opportunity to educate himself on that process is evidence squarely, and compellingly, contradicted by evidence submitted by Defendant. As was set forth above, Defendant has submitted the admission and orientation checklists signed by Plaintiff upon his admission to MCF and other IDOC correctional institutions. In support of his Statement of Material Facts, Defendant has also submitted affidavits from correctional officials that detail the grievance process and confirm that it is IDOC policy for that procedure to

be covered at orientation and to be made available to inmates. Additionally, Defendant

has submitted Plaintiff's grievance record, which shows that Plaintiff filed at least one

grievance before the events of this case that was pursued through the appeal stage.

Plaintiff has made no argument as to why any of this evidence should be disregarded or

does not reflect the true extent of his knowledge or lack thereof. Finally, even if,

*arguendo*, MCF had failed to adequately instruct Plaintiff in its grievance processes—

whether by way of neglecting instruction entirely or by way of neglecting to cover all

aspects of the process in sufficient detail—Plaintiff has presented neither argument nor

evidence that, knowing of the grievance process's existence but not its contents, he ever

requested copies of or more information about that grievance process, much less was

denied one or both of these.

 For all of the above reasons, the Court does not believe a reasonable fact-finder

can conclude that MCF made its grievance process unavailable to Plaintiff by way of

failing to instruct him in it.

### vi.  Applicability of the Doctrine of Equitable Estoppel

 Finally, Plaintiff argues, seemingly as a corollary  of his availability argument,

that, insofar as MCF made administrative remedies unavailable to him by incorrectly

rejecting one of his grievances and thus failing to follow its own grievance procedures,

Defendant should be estopped from raising the exhaustion defense.

 Our circuit has repeatedly and "explicitly avoided deciding whether equitable

estoppel applies" to the exhaustion requirement of the PLRA. *Kaba,* 458 F. 3d at 687.

Assuming it applies, however, to establish equitable estoppel, "the party claiming

estoppel must show: (1) a misrepresentation by the opposing party; (2) reasonable reliance on that misrepresentation; and (3) detriment." *Lewis*, 300 F.3d at 834.  Further, "[w]hen asserting equitable estoppel against the government, one must also prove affirmative misconduct." *Id.* Affirmative misconduct requires an affirmative act to misrepresent or mislead . . . [and] a government's failure to discharge an 'affirmative obligation' is not the same as engaging in 'affirmative misconduct.' . . . Moreover, omissions amount only to ordinary negligence." *Id.*

The Court notes that the only case cited by Plaintiff in support of his equitable estoppel argument is not from our circuit and so is not persuasive. *See Abney v. McGinnis*, 380 F.3d 663, 667 (2nd Cir. 2004). However, even assuming equitable estoppel could be applied to Defendant, it would not ensure success for Plaintiff.

First, it is by no means clear, judging from the facts presented here, that IDOC did in fact fail to follow its own process with respect to Plaintiff's rejected March 5 grievance. Though it is possible the grievance *was* incorrectly marked as having been submitted late, Plaintiff admits that untimeliness was not the only reason given for the grievance's rejection, and Plaintiff has made no argument to contest the legitimacy or sufficiency of the second reason, namely that the grievance was primarily addressing a matter not appropriate to the grievance process.

Second, having not mentioned any role played by Defendant in the rejection of the relevant grievance, Plaintiff has not shown any misrepresentation made by the opposing party. Further, Plaintiff has not shown or argued the presence of an "affirmative act to misrepresent or mislead," which is a necessary part of the affirmative

misconduct that must be proven when asserting estoppel against the government. *Lewis*, 300 F.3d at 834. Assuming Plaintiff *could* show that Defendant or another IDOC official "failed to follow the grievance process" by way of incorrectly rejecting his grievance as untimely, Plaintiff has presented no argument or evidence as to why this would amount to any more than a failure to discharge an affirmative obligation, rather than affirmative misconduct.

Plaintiff has not asserted that any IDOC employee actively falsified the date on his returned grievance form or purposefully failed to process it speedily, instead of simply making a mistake when marking it or being innocently slow to handle it. Further, again assuming that the grievance ought to have been received on March 5th rather than March 9th, and that IDOC did take longer than its allotted ten business days to reply to Plaintiff's grievance, Plaintiff in that case was permitted to appeal the grievance as if it had been denied. He failed to do so, even though the administrative remedy of appeal was available to him.

Plaintiff cites *Dole,* 438 F.3d at 809-10, to the effect that "a plaintiff's claim cannot be dismissed if [sic] 'prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting.'" However, Plaintiff's grievance was *not* properly filed insofar as it grieved a matter inappropriate to IDOC's process, and Plaintiff has not countered this argument. Further, even if Plaintiff's March 5th grievance is regarded as having been properly filed, it is still the case that, unlike the grievance in *Dole*, Plaintiff's grievance neither alleged any wrongdoing by Defendant in particular nor requested relief for the

particular harms alleged in this case. *Dole,* 438 F.3d at 807.

Therefore, equitable estoppel does not apply to save Plaintiff's suit against Defendant Breaton.

**IV.    CONCLUSION**

Based on the foregoing, Defendant's Motion for Summary Judgment is **GRANTED**. [DE 24].

**SO ORDERED** this 24th day of September 2025.

s/Scott J. Frankel
Scott J. Frankel
United States Magistrate Judge